UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DARRELL THEODORE KIND,

Plaintiff,

v.

SHERIFF FRANK, SGT. HEINEN, DAN LUKE, SGT. ALHGREN, and SGT. WANIKE,

Defendants.

Civil No. 00-1843 (ADM/FLN)

**REPORT AND RECOMMENDATION**

Plaintiff, an inmate at the U.S. Penitentiary in Leavenworth, Kansas, is seeking relief for several alleged violations of his federal constitutional rights, which purportedly occurred while he was confined as pre-trial detainee at the Washington County Jail in Stillwater, Minnesota. He claims that Defendants (a) violated his First Amendment right to freely exercise his religious beliefs, (b) deprived him of his constitutional right of access to the courts, and (c) retaliated against him for attempting to assert his constitutional rights.[1]

Defendants have filed a motion for summary judgment supported by a memorandum of law and various affidavits and exhibits. Plaintiff has filed his opposition to the motion, and the motion is therefore ready for disposition. The matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, it will be recommended Defendants' summary judgment motion be granted, and that this action be DISMISSED WITH PREJUDICE.

[1] Plaintiff has also claimed that he was deprived of certain personal property without due process, but that claim has already been rejected, because there were adequate post-deprivation remedies available to him. (See Report and Recommendation dated August 9, 2000, [Docket No. 5], at pp. 3-4, and Order adopting Report and Recommendation dated September 28, 2000, [Docket No. 10], at p. 3.)

FILED JAN 22 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## I. BACKGROUND

For several months during 1998, Plaintiff was held in various state and local detention facilities around the Twin Cities, while awaiting trial on federal criminal charges pending in this District. In late March of that year, he was transferred from the Carver County Jail to the Washington County Jail. Upon arriving there, Plaintiff promptly informed jail officials that he could eat no meat because he was a Muslim. He changed that assertion several months later, indicating that his religious beliefs prevented him only from eating pork. (Affidavit of James R. Andreen, [Docket No. 39], Exhibit 31.) In the meantime, however, the jail's Senior Program Director, Defendant Dan Luke, attempted to address Plaintiff's original "no meat" request.

Luke consulted various materials that he had acquired from the Institute of Islamic Information in Chicago, Illinois, and the Department of Islamic Affairs in Washington, D.C. He also spoke to a representative of the Islamic Center of Minnesota. Based on the information he received from those sources, Luke concluded that Muslims are taught not to eat pork, but they are not forbidden from eating other types of meat. (Affidavit of Dan Luke, [Docket No. 40], ¶ 5.) Therefore, Plaintiff was offered a special pork-free diet, but he was not offered a diet devoid of all meat.

Plaintiff later filed a grievance with the Minnesota Department of Human Rights, claiming that the Washington County Jail was violating his right to religious freedom by failing to provide him a special meatless diet. After the Department found probable cause to support Plaintiff's grievance, Washington County agreed to adopt a new policy that would allow any inmate to request, for any reason, only vegetarian meals. (Plaintiff's opposition to Defendants' motion for summary judgment, [Docket No. 50], Exhibits 10-13.) The

County's new policy did not go into effect, however, until after Plaintiff had left the Washington County Jail.

While he was still confined at the Washington County Jail, Plaintiff had numerous confrontations with members of the jail staff. Within a few days after his arrival at the jail, he received an "incident report" after repeatedly demanding to use a recreational room that was not then available to him. (Andreen Aff., Exhibit 5.) A few days later, he received another incident report for not returning a timer that he had borrowed. (Id., Exhibit 10.) Two weeks after that, Plaintiff received an incident report for being uncooperative and yelling at jail officials. (Id., Exhibit 17.) The next day he received another incident report when he failed to clean his cell after being ordered to do so. (Id., Exhibit 18.) Four days later, on April 18, 1998, he was placed on "23-hour lock-down" status for "excess items in cell" and "refusal to answer officer['s] questions." (Id., Exhibit 22.)

On or about April 24, 1998, Plaintiff was transferred to the Minnesota Correctional Facility at Oak Park Heights, Minnesota. (The record does not disclose why that transfer occurred, or who was responsible for effecting the transfer.) Approximately six weeks later, Plaintiff was returned to the Washington County Jail for a second time. He remained there from June 30, 1998, until August 13, 1998, when he apparently left for the final time.

During his second stint at the Washington County Jail, Plaintiff was involved in many more disciplinary incidents. On July 1, 1998, (just one day after his return to the jail), he received an incident report for kicking a door and disturbing others. (Id., Exhibit 26.) On July 10, 1998, he received an incident report for disturbing other inmates by changing the channel on a television set. (Id., Exhibit 27.) According to the official who prepared that report –

> "I advised Kind that the TV would remain on channel #8 until the movie was over. Kind immediately initiated an argument, using profanity directed at me. I ordered Kind to lock down, his response was to ignore my command and walk away. I gave Kind a second order to lock down. Kind reluctantly locked down after three commands to [do] so."

(Id.)

On July 20, 1998, Plaintiff received an incident report for placing a shoe in a ceiling vent. (Id., Exhibit 32.) The next day, he received another incident report for raising his voice to a jail staff member, and ignoring a direct order. (Id., Exhibit 34.) Later that same day, a staff member discovered eight pornographic magazine pictures, as well as pamphlets containing "sexually explicit verbiage," hidden in some of Plaintiff's supposed "legal material." (Id., Exhibit 36.) As a result of these final two incidents of misconduct, Plaintiff was placed in segregated confinement.

During his final two weeks in the Washington County Jail, (the first two weeks in August 1998), Plaintiff continued to flout the jail's regulations. On August 1, 1998, he claimed that he had to see "the duty sergeant" immediately, because of an "emergency security safety" matter. However, he refused to disclose the nature of the "emergency," and jail officials ultimately concluded that he was simply looking for attention. (Id., Exhibits 39 and 42.) On the same day, he also received an incident report for hoarding books in his cell. (Id., Exhibits 40 and 42.) He received further disciplinary sanctions, (placement in a "small unit," loss of library privileges for ten days, and a 48-hour lockdown), after being found guilty of violating several rules in connection with those two incidents. (Id., Exhibit 45.) As previously noted, he finally left the Washington County Jail for the last time on August 13, 1998.

## III. STANDARD OF REVIEW

When considering a motion for summary judgment, the Court must determine whether there are any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). When there is no reasonable construction of the facts that would allow the nonmoving party to prevail, the remedy of summary judgment is appropriate. Matsushita, 475 U.S. at 587-88. The role of the court is not to weigh the evidence, but to determine whether, as a matter of law, a genuine factual conflict exists. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences that can be drawn from the facts. Id.

If a motion for summary judgment is properly supported by affidavits or other evidence, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324; Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 585 (8th Cir. 1987), cert. denied, 484 U.S. 1010 (1988). The nonmoving party may not merely rest upon the allegations or denials in his pleadings. Id.

The Court is mindful that pro se pleadings should be liberally construed. Haines v. Kerner, 404 U.S. 519, 520 (1972); White v. Bond, 720 F.2d 1002, 1003 (8th Cir. 1983). Therefore, pro se pleadings are held to less stringent standards when challenged by motions to dismiss or for summary judgment. Haines, 404 U.S. at 520; Horsey v. Asher, 741 F.2d 209, 211 n.3 (8th Cir. 1984). Nonetheless, a pro se plaintiff's claim cannot survive

a motion for summary judgment unless, in some form, he can fairly be said to have set forth specific facts demonstrating that there is a genuine issue for trial. Quam v. Minnehaha County Jail, 821 F.2d 522 (8th Cir. 1987); Miller v. Solem, 728 F.2d 1020, 1023, (8th Cir.), cert. denied, 469 U.S. 841 (1984).

## III. DISCUSSION

As mentioned at the outset, Plaintiff is attempting to bring three claims in this action: (1) that he was deprived of his First Amendment right to religious freedom because he was not provided a meatless diet; (2) that he was deprived of his constitutional right of access to the courts; and (3) that he was subjected to "retaliation" because he tried to assert his constitutional rights while he was confined at the Washington County Jail. For the reasons discussed below, the Court finds that Defendants are entitled to summary judgment on all three of these claims.

### A. Freedom Of Religion Claim

Defendants argue, inter alia, that they are entitled to qualified immunity with regard to Plaintiff's freedom of religion claim. We agree.

"Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Yowell v. Combs, 89 F.3d 542, 544 (8th Cir. 1996), citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity protects 'all but the plainly incompetent or those who willingly violate the law.'" Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998), quoting Malley v. Briggs, 475 U.S. 335, 341 (1986).

To determine whether a government official is entitled to qualified immunity, a court must perform a two-prong analysis. First, the court must "determine whether the plaintiff

has alleged the violation of a constitutional right." Manzano v. South Dakota Dept. of Social Services, 60 F.3d 505, 509 (8th Cir. 1995). Second, the court must determine if the constitutional principle at issue was so clearly established at the time of the defendant's actions that a reasonable government official would have known that he or she was violating the plaintiff's constitutional rights. Id. See also Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998) (en banc) ("First, the court must see if a deprivation of constitutional magnitude has been alleged. If so, the court must determine if that right was so clearly established that a reasonable public official would have known his or her conduct violated the Constitution at the time of the act.")

"For a constitutional right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Manzano, 60 F.3d at 509, quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). This does not mean that there must be precedential case law that is factually indistinguishable from the plaintiff's case. Anderson, 483 U.S. at 640 (the issue is not whether "the very action in question has previously been held unlawful"). However, it "must be apparent" that the defendant's actions are unlawful "in the light of pre-existing law." Id. Furthermore, the issue is not whether the alleged constitutional right exists in a general or abstract sense; but rather, whether such right is clearly assertable under the facts of the plaintiff's own particular case. As explained by our Court of Appeals, the plaintiff "must show the right was clearly established in a particularized sense relevant to the case at hand." Mettler v. Whitledge, 165 F.3d 1197, 1203 (8th Cir. 1999) (emphasis added). In some recent decisions, the Eighth Circuit has actually divided the second half of the two-prong analysis into two separate subparts – (1) whether the constitutional right

in question was clearly established at the time of the alleged violation, and (2) whether a reasonable official would have known that he or she was, in fact, violating that right, given the particular facts of the case. Yowell, 89 F.3d at 544; Mettler, 165 F.3d at 1202.

In the instant case, Plaintiff has passed the first part of the qualified immunity test, as he has alleged that Defendants deprived him of his constitutional rights under the First Amendment. More specifically, he has accused Defendants of violating the First Amendment's "Free Exercise" clause by failing to accommodate the dietary restrictions allegedly commanded by his religion. The real issue in this case arises under the second part of the qualified immunity test -- i.e., whether, given the facts of record here, reasonable officials in Defendants' positions should have known that they were violating Plaintiff's clearly established First Amendment rights by failing to offer him a meatless diet.

It is well-settled that jail and prison inmates "have the right to be provided with food sufficient to sustain them in good health [and] that satisfies the dietary laws of their religion." McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987), citing Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir. 1975). Following this principle, several courts have expressly recognized that Muslims have a constitutional right to receive a pork-free diet, because their religion proscribes the consumption of pork. See e.g., Masjid Muhammad-D.C.C. v. Keve, 479 F.Supp. 1311, 1318 (D.Del. 1979) ("Muslim inmates are entitled to a diet which provides them with adequate nourishment without the consumption of pork"); Kahane, supra (same); Ross v. Blackledge, 477 F.2d 616 (4th Cir. 1973) (same); Barnett v. Rodgers, 410 F.2d 995 (D.C.Cir. 1969) (same).

It is not well-established, however, that Muslims must be offered a meat-free diet because their religion forbids them from eating any meat of any kind. The Defendants in

this case -- most notably Defendant Luke[2] – evidently were familiar with Islam's teachings about pork, but had never heard of an Islamic ban against all types of meat. Defendant Luke, acting for himself and the rest of the staff of the Washington County Jail, attempted to educate himself about the teachings of Islam, and concluded that Islam does not bar the consumption of all types of meat. Luke therefore determined that Plaintiff should be given a pork-free diet, but not a meat-free diet.

The issue to be decided here is not whether Plaintiff did, in fact, have a constitutional right to a meat-free diet. As previously noted, "[q]ualified immunity protects government officials performing discretionary functions from liability for damages so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000), quoting Harlow, 457 U.S. at 818. Therefore, to resolve a qualified immunity claim "requires more than a determination that a particular right is 'clearly established' in the abstract;" it is also necessary to "examine whether reasonable officials could have believed their actions violated clearly established law, given the information available to the officials at the time." Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996) (citations omitted). In other words, the court must decide whether the governmental defendants held an objectively reasonable belief that they were not violating the plaintiff's constitutional rights. Curry, 226 F.3d at 977

[2] Although Plaintiff has not expressly indicated which of the named Defendants his First Amendment claim is brought against, the record clearly shows that only Defendant Luke was directly responsible for the decision to deny Plaintiff's request for a meat-free diet. Thus, while the parties (and the Court) generally tend to refer to Defendants as a group, in fact, the only party who might have actually violated Plaintiff's First Amendment rights is Defendant Luke. The qualified immunity analysis must therefore be focused on Luke's conduct.

("the critical issue for qualified immunity purposes is whether it was 'objectively legally reasonable' for the prison official to believe that his conduct did not violate the inmate's clearly established" constitutional rights.)[3]

In this case, the Court finds, as a matter of law, that it was objectively reasonable for Defendants to believe that they were not violating Plaintiff's First Amendment rights when they offered him a pork-free diet, but not a meat-free diet. There is no evidence suggesting that Defendant Luke, or any other Defendant, had reason to believe he was violating Plaintiff's rights by offering him a pork-free diet. To the contrary, the evidence suggests that Defendant Luke, and the rest of the Defendants, had good reason to believe that the dietary restrictions of Plaintiff's religion would be met by giving him a pork-free diet. Luke, the person who was responsible for making decisions about Plaintiff's diet, made a concerted effort to discover the true dietary restrictions of Plaintiff's religion. He sought information on the issue from not just one pertinent resource, but three – the Institute of Islamic Information in Chicago, Illinois, the Department of Islamic Affairs in Washington, D.C., and the Islamic Center of Minnesota. All three of those resources led Luke to believe that Islam forbids only the consumption of pork.

---

[3] If Plaintiff were seeking injunctive relief, rather than purely money damages, it might be necessary to determine whether he actually has a constitutional right to a vegetarian diet to ensure that his constitutional rights are protected in the future. Because Plaintiff is no longer confined at the Washington County Jail, and there is no reason to believe he ever will return there, he cannot be granted any prospective relief in this matter. See Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (prisoner claims for injunctive relief rendered moot by transfer to a different institution). It is therefore unnecessary, in this particular case, to actually adjudicate the full parameters of Plaintiff's dietary rights under the Constitution. For purposes of the qualified immunity analysis, it is only necessary to decide whether Defendants had reason to believe that they were violating Plaintiff's rights.

This case is quite similar to DeHart v. Lehman, 9 F.Supp.2d 539 (E.D.Pa. 1998). In DeHart, an inmate claimed that prison officials violated his First Amendment rights by not giving him a vegetarian diet to satisfy his beliefs as a Buddhist. The defendants denied the inmate's request for a special diet based on information obtained from the Philadelphia Buddhist Association. In granting the defendants' request for qualified immunity, the court emphasized that "evidence presented by Defendants suggest that their refusal of Plaintiff's request [for a vegetarian diet] was made in good faith because they made an effort to obtain sufficient information to decide whether or not to grant Plaintiff's dietary requests." Id. at 543. The court in DeHart found that the defendants were entitled to qualified immunity, based largely on their "good faith effort to inform themselves" about the dietary requirements of the plaintiff's religion. Id.

Here too, the Defendants made a good faith effort to determine the dietary restrictions of Islam, so that Plaintiff could follow the teachings of his religion while he was detained at the Washington County Jail. Plaintiff's request for a special vegetarian diet was denied only after Luke had made a good faith effort to ascertain the dietary restrictions of Plaintiff's religion.

The Court also notes that there does not appear to be any case law or other legal authority supporting Plaintiff's assertion that Islam forbids him from eating all forms of meat. Plaintiff has not cited any reported cases involving the specific issue presented here -- namely, whether Muslims must be offered a meat-free diet, as opposed to merely a pork-free diet. Nor has the Court independently located any such cases. In fact, the reported cases that have considered Islam's dietary restrictions clearly suggest that Muslims are barred only from eating pork. See e.g., Hayes v. Long, 72 F.3d 70, 74 (8th Cir. 1995)

(noting that after Hutto v. Finney, 437 U.S. 678 (1978), "it was clearly established... that Muslim inmates have the right to avoid contact with pork or with any food that has been contaminated by pork"); Abdullah v. Fard, 974 F.Supp. 1112, 1117 (N.D.Ohio 1997) (noting that "the prohibition against eating pork or pork by-products is a fundamental tenet of Islam"), aff'd 173 F.3d 854 (6th Cir. 1999) (table); Hunafa v. Murphy, 907 F.2d 46, 47 (7th Cir. 1990) ("eating pork is contrary to the tenets of Islam"). Again, the Court has not found any case law, or any other legal authority, suggesting that Muslims are forbidden from eating meat other than pork.

It should be emphasized that we are not questioning the sincerity of Plaintiff's religious beliefs,[4] nor are we suggesting that only broadly held religious beliefs warrant First Amendment protection. The issue presented here is not whether Plaintiff actually had a constitutional right to a vegetarian diet based on his religious beliefs; rather, the issue is whether it was reasonable for Luke and the other Defendants to believe that a pork-free diet would satisfy Plaintiff's constitutional rights. Given the results of Luke's research, and the apparent absence of any case law supporting Plaintiff's assertions about the dietary commands of Islam, the Court finds that Defendants reasonably could have believed that their conduct did not violate Plaintiff's clearly established constitutional rights. Therefore, regardless of the ultimate constitutionality of their actions, Defendants are entitled to qualified immunity under the facts of record in this particular case.

---

[4] It is interesting to note, however, that in a grievance form dated July 13, 1998, Plaintiff stated that "for religion purposes I don't eat pork." (Andreen Aff., Exhibit 31, [emphasis added].) Plaintiff's failure to mention other types of meat certainly could raise some questions about the true nature of his religious beliefs.

B. Access To The Courts Claim

Plaintiff's claim that he was denied access to the courts is based on vague allegations that some of the Defendants interfered with his "legal mail." It is further alleged that Defendants prevented him from making "legal phone calls," and refused to give him certain books and writing materials that he requested. It is unnecessary to review all of the details of these allegations in depth, because there is one fatal flaw in Plaintiff's access-to-the-courts claim that causes it to fail no matter what type of interference may have occurred.

To prevail on an access-to-the-courts claim, a prisoner must demonstrate some "actual injury." Lewis v. Casey, 518 U.S. 343, 349 (1996). See also, Klinger v. Department of Corrections, 107 F.3d 609, 617 (8th Cir. 1997) ("[i]n Lewis v. Casey, the Supreme Court held, based on principles of standing, that actual injury must be proven in order to prevail on an access-to-courts claim"). There is no "abstract, freestanding right" of access to legal resources; the inmate must show that he has been deprived of some specific opportunity to defend himself, or advance a viable legal claim, in some particular action. Lewis, 518 U.S. at 351; Sabers v. Delano, 100 F.3d 82, 84 (8th Cir. 1996) (per curiam). He also must identify some specific injury resulting from that lost opportunity. Id.

While a pro se pleading is to be liberally construed, it still must allege facts, which if proven true, would entitle the plaintiff to some legal relief against the named defendant(s). Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) ("[a]lthough it is to be liberally construed, a pro se complaint must contain specific facts supporting its conclusions"). Thus, to maintain an actionable claim for denial of access to the courts, a prisoner must allege specific facts, which if ultimately proven true, would satisfy the "actual injury"

requirement of Lewis v. Casey. A prisoner who claims that he has been denied his constitutional right of access to the courts must allege facts showing some specific harm to a particular legal right, which is directly attributable to inadequate access to legal resources. Pilgrim v. Littlefield, 92 F.3d 413, 416 (6th Cir. 1996) ("plaintiffs must plead and prove prejudice stemming from the asserted violation"). "[I]n order to establish a claim of constitutional dimensions, an inmate must come forward with something more than vague and conclusory allegations of harm. He must establish some specific prejudice...." Bannan v. Angelone, 962 F.Supp. 71, 74 (W.D.Va. 1996). "Plaintiffs must demonstrate, for example, that the inadequacy" of access to legal resources "caused such actual injury as the late filing of a court document or the dismissal of an otherwise meritorious claim." Pilgrim, 92 F.3d at 416. See also, Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996).

The actual injury requirement applies not only where prisoners are challenging the adequacy of law libraries and legal assistance, but also where they are complaining about other conduct that allegedly interferes with their ability to participate in court proceedings -- including alleged interference with prisoner mail. Costello v. Hynes, No. 96 CIV 6808(LBS), (S.D.N.Y. 1997), 1997 WL 580704 at *3 (access to courts claim dismissed where "Plaintiff does not demonstrate actual injury as a result of the claimed interference with his legal mail"); Brown v. Williams, No. 95 CV 3872(SJ), (E.D.N.Y. 1998), 1998 WL 841638 at *5 (access to courts claim dismissed where "Plaintiff has neither established that the treatment of his mail prevented him from presenting his case in a meaningful way nor shown that some prejudice or [the] denial of a legal claim resulted from the undelivered mail"); Easter v. Hill, No. 95-3047-KHV, (D.Kan. 1997), 1997 WL 30553 at *5 (same); Rivera v. Chesney, No. CIV. A. 97-7547 (E.D.Pa. 1998) 1998 WL 639255 at *2 (same). See also, Myers, 101

F.3d at 544 (Lewis rule applied to claim based on alleged deprivation of writing and mailing materials).

In this case, Plaintiff's access-to-the-courts claim is plainly deficient, because he has not identified any specific instance in which he lost a specific legal right as a direct result of Defendants' alleged interference with his legal correspondence, legal materials, or legal resources. There are no facts suggesting that Plaintiff has actually lost any specifically identified claim or defense in any pending or contemplated legal proceeding, which would have been preserved if not for Defendants' alleged interference.

In sum, even with the benefit of liberal construction, Plaintiff's submissions will not support an actionable claim for denial of access to the courts, because he has not adequately identified any "actual injury." At most, Plaintiff has vaguely suggested that he may have been able to assert his legal rights more effectively if Defendants had allowed him greater access to legal papers and/or legal resources. But those vague suggestions are purely conclusory; they will not support an actionable access-to-the-courts claim, because they include no specific facts showing that any specific claim or defense actually has been lost as a direct result of Defendants' alleged misconduct. See Sabers, 100 F.3d at 84 (access-to-courts claim was properly dismissed where prisoner "offered no facts" showing that alleged lack of legal resources actually "prejudiced her in a legal case").

C. Retaliation Claim

Plaintiff also claims that he was subjected to retaliation when he attempted to assert his constitutional rights of religious freedom and access to the courts. He contends that Defendants disciplined him, and transferred him to Oak Park Heights, because he attempted to exercise those constitutional rights while he was incarcerated at the

Washington County Jail.[5]

An act against a prisoner that is done in retaliation for the prisoner's exercise of a constitutional right may give rise to a § 1983 claim, even though that act would not otherwise support such a claim. Murphy v. Missouri Dept. of Correction, 769 F.2d 502 (1985); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989). Therefore, an inmate who is transferred to another institution because he asserted some constitutional privilege may be able to bring a retaliation claim, even though, as a general rule, prison transfers are perfectly constitutional. See Olim v. Wakinekona, 461 U.S. 238, 250 (1983), (prison authorities "may transfer a prisoner 'for whatever reason or for no reason at all'"), quoting Meachum v. Fano, 427 U.S. 215, 228 (1976). To sustain such a claim, a prisoner would have to show that his transfer was strictly retaliatory; i.e., that he would not have been transferred "but for" the defendant's retaliatory motive. Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993), cert. denied, 512 U.S. 1209 (1994); Hazen v. Reagen, 16 F.3d 921, 925-26 (8th Cir. 1994).

Sometimes retaliation claims arise from prison disciplinary actions that allegedly were initiated for retaliatory purposes. In such cases, the plaintiff must show that the charges were groundless. If the plaintiff cannot meet that burden, the charges will be deemed to have been brought for legitimate, non-retaliatory reasons, and the claim will be dismissed. Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990); Goff v. Burton, 7 F.3d at 738-39; Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994), cert. denied, 515 U.S.

---

[5] It should be noted that even if Plaintiff's retaliation claims were not dismissible for the reasons discussed hereafter, he still could not recover on those claims, because he has not specifically identified which of the individual Defendants allegedly retaliated against him.

1145 (1995).

The critical issue in all retaliation cases is whether the claimant can demonstrate that the defendant's retaliatory motive was the sole cause of the defendant's contested action. To state an actionable § 1983 retaliation claim, the plaintiff must establish that the defendant's allegedly wrongful action was performed only because the defendant wanted to punish the plaintiff for exercising his constitutional rights. See Goff, 7 F.3d at 738 ("the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred").

Thus, in the instant case, Plaintiff must show that his transfer to Oak Park Heights, and the various disciplinary sanctions imposed against him at the Washington County Jail, resulted solely from Defendants' desire to punish him for asserting his constitutional rights of religious freedom and access to the courts. Based on the evidence of record, no reasonable trier of fact could find that Plaintiff was disciplined and sent to Oak Park Heights solely because he tried to assert his constitutional rights. To the contrary, the record clearly demonstrates that Plaintiff was transferred and disciplined because he constantly misbehaved. He repeatedly defied directions from jail personnel, created disturbances, and otherwise flouted the jail's rules of conduct.[6] Because Plaintiff cannot show that he was transferred and disciplined merely because he attempted to exercise his constitutional rights, he cannot sustain a retaliation claim. See id., ("if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules

[6] Plaintiff's jailhouse behavior was so offensive that even the presiding judge in his criminal case felt compelled to admonish him for it. (Transcript from sentencing hearing before Judge Paul A. Magnuson on November 12, 1998; Plaintiff's memorandum, [Docket No. 50], Exhibit 30.)

or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail").

**IV. CONCLUSION**

For the reasons discussed above, the Court concludes, as a matter of law, that Plaintiff cannot succeed on any of his three current causes of action. It will therefore be recommended that Defendants' motion for summary judgment, (Docket No. 37), be granted. Concomitantly, it will also be recommended that Plaintiff's "motion" opposing Defendants' request for summary judgment, (Docket No. 49), be denied.

Finally, it will be recommended that Plaintiff's pending motion for production of documents, (Docket No. 48), be denied. Plaintiff's motion is untimely, because it was filed more than six weeks after the extended cut-off date for discovery motions, (which was originally set by the Court's pretrial scheduling order of November 8, 2000, [Docket No. 17], and modified by the Court's order of April 10, 2001, [Docket No. 26]). Furthermore, Plaintiff has offered no reason to believe that the outcome of Defendants' summary judgment motion would have been different, if Plaintiff had received the documents he was seeking. See Bradford v. DANA Corp., 249 F.3d 807, 810 (8th Cir. 2001) ("Federal Rule of Civil Procedure 56(c) does not require discovery to be complete in order for summary judgment to be proper... Federal Rule of Civil Procedure 56(f) does permit a party opposing a summary judgment motion to seek additional discovery, but only upon a showing of facts that the party expects to uncover").

**V. RECOMMENDATION**

Based upon the above, and upon all of the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1. Defendants' Motion For Summary Judgment, (Docket No. 37), be GRANTED;

2. Plaintiff's "Motion Opposing Defendant(s) Request For Summary Judgment," (Docket No. 49), be DENIED;

3. Plaintiff's "Motion Requesting Production Of Documents And Sanction For Failure To Comply," (Docket No. 48), be DENIED; and

4. This action be DISMISSED WITH PREJUDICE.

Dated: JAN 22, 2002

FRANKLIN L. NOEL
Chief Magistrate Judge

Under D.Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by Feb. 8, 2002, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.